HAYWARD *v.* HAYWARD, ADMINISTRATOR, ET AL.

[No. 9,216.    Filed April 26, 1917.    Rehearing denied June 28, 1917.    Transfer denied October 30, 1917.]

1.  PLEADING.—*Answers.*—*Allegations in Petition.*—*Admission by Failure to Traverse.*—Facts alleged in a petition for distribution of a decedent's estate must be taken as conceded, where not traversed by answer.    p. 446.

2.  APPEAL. — *Review.* — *Ruling on Demurrer to Answer.* — *Reversal.*—Where judgment was rendered against plaintiff on his refusal to plead over after the overruling of his demurrers to paragraphs of answer, if any one of such paragraphs is good as against demurrer, it alone is sufficient to support the judgment, and the cause will be affirmed.    p. 448.

3.  DOMICIL.—*Residence.*—Domicil means more than residence, since a domicil is a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time, and, while a man may have several residences at the same time, he can only have one domicil at a time and may be a resident of a particular locality without having a domicil there.    p. 449.

4.  DOMICIL.—*Change of Domicil.*—*What Constitutes.*—To constitute a change of domicil there must be residence at another place, and an intention to abandon the old domicil and to ac-quire a new one.    p. 450.

5. INSANE PERSONS.—*Residence.—Acquisition.*—Where one mentally incompetent was removed by relatives from one state to another, and was maintained and cared for in the latter until her death, she acquired a residence there. p. 450.

6. DOMICIL.—*Change of by Incompetent Person.—Intent.—Time of Residence.*—Where one mentally incompetent was removed by relatives from her domicil in one state to another state, she could not, because of her mental incapacity, have formed an intention to change her domicil, and the length of time that she resided in the latter state is of itself unimportant. p. 451.

7. DOMICIL.—*Nature of.*—The term "domicil" is expressive of a relation between person and place, and indicates various degrees of comprehensiveness, as there may be a national domicil, relating to residence in a nation, a quasi-national domicil, relating to residence in a state, and a municipal or domestic domicil, relating to residence in a county, township or municipality. p. 451.

8. DOMICIL. — *Change of. — Incompetent Persons.—Descent and Distribution.*—As a change in municipal domicil involves no laws affecting the descent and distribution of property the courts are more liberal in recognizing the power of a proper representative to change the municipal domicil of an incompetent person or a person *non sui juris* than where the change is of national or quasi-national domicil. p. 451.

9. DOMICIL.—*Quasi-National.—Change of.—Incompetent Person. —Authority of One not Related.*—Where decedent was mentally incompetent, the mother of her next of kin, who was not related to deceased by blood and not her legal guardian, could not on her own motion or at request of decedent affect a change in the latter's domicil from one state to another so as to change the law governing the descent and distribution of property. p. 452.

10. DOMICIL.—*Insane Persons.—Change of Domicil.—Powers of Guardian.*—The guardian of an insane person does not have the power or authority, by virtue of his office, on his own motion to change the legal domicil of his ward from one state to another, so as to affect the distribution or succession of the ward's property on his decease, and especially where the ward, although residing in the jurisdiction of the appointment, is legally domiciled in another state. p. 460.

11. INSANE PERSONS.—*Guardians.—Jurisdiction of Court.—Statutes.*—Primarily, in the absence of a statute, chancery courts have jurisdiction in matters affecting the welfare and the personal property and rights of the insane, but in this state such power is lodged by §3101 *et seq.* Burns 1914, Acts 1895 p. 205, in courts having probate jurisdiction, and where a guardian is

appointed his powers and duties, as prescribed by §§3068, 3107 Burns 1914, §§2521, 2551 R. S. 1881, must be performed under the court's supervision.   p. 461.

12.  DOMICIL.—*Domicil of Insane Person.—Change of.—Powers of Guardian.—Order of Court.*—An appointed guardian may change the quasi-national domicil of his ward only by proceeding under an order of court.   p. 462.

13.  JUDGMENT. —.*Conclusiveness.—Residence.—Collateral Attack.* —Where a court, with power to act in the general subject-matter involved, determines a jurisdictional question of residence in a proceeding to appoint a guardian, or administrator, the determination of the court for the purposes of executing the involved trust and transacting the business thereof is conclusive against collateral attack.   p. 464.

14.  INSANE PERSONS. — *Appointment of Guardian. — Statute.— Scope.*—Section 3101 Burns 1914, Acts 1895 p. 205, governing proceedings to determine whether an "inhabitant" of the county is of unsound mind and incapable of managing his own estate, is broad enough to be applicable in a proceedings to determine the mental competency of a person having property and an established business in this state, and living here under circumstances indicating a permanency of residence, although his legal domicil is in fact elsewhere.   p. 465.

15.  INSANE PERSONS.—*Guardian.—Appointment.—Statute.*—Sections 3105, 3106 Burns 1914, §§2549, 2550 R. S. 1881, relating to the appointment of guardians for insane persons, apply to cases where the insane persons are outside the state or county, but property belonging to them is located therein.   p. 465.

16.  INSANE PERSONS.—*Adjudication of Insanity in Guardianship Proceedings.—Scope of Inquiry.—Conclusiveness of Judgment.* —An adjudication of unsoundness of mind, in a proceeding under §3101 *et seq.* Burns 1914, Acts 1895 p. 205, for the appointment of a guardian for a person of unsound mind, is not conclusive, as to the sanity of the person involved, in another proceeding in which is questioned his mental capacity in some respect other than the management of his own estate.   p. 467.

17.  INSANE PERSONS.—*Appointment of Guardian.—Interest of Public.*—A proceeding for the appointment of a guardian for an insane person is based on the theory that the public has an interest in their welfare and in the preservation of their property, and the public rather than the person instituting the proceeding is the real party in interest.   p. 467.

18.  INSANE PERSONS.—*Adjudication of Insanity in Guardianship Proceeding.—Scope.—Conclusiveness.*—Where one mentally incompetent was removed by a relative from her legal domicil in Kentucky to Indiana, and subsequently, while residing in

this state, she was adjudged of unsound mind and a guardian was appointed to manage her estate under the provisions of §3101 *et seq.* Burns 1914, Acts 1895 p. 205, the court's determination of the question of her inhabitancy in that proceeding was conclusive only for the purposes thereof, and was not an adjudication of domicil for the purpose of determining what laws govern the descent and distribution of her personal property. p. 468.

19. PLEADING. — *Complaint.—Admissions.—Sufficiency.—*A complaint which merely alleges that certain relatives of one mentally incompetent removed her from one state to another for the purposes of care and medical attention, does not admit that such relatives changed her domicil.  p. 469.

From Vanderburgh Circuit Court; *Edwin Taylor,* Special Judge.

Petition by Edward J. Hayward for the distribution of the estate of Sarah M. Drew, deceased, opposed by Charles W. Hayward, administrator, and others. From the judgment rendered, the petitioner appeals. *Reversed.*

*J. W. Blue, Jr., John H. Foster* and *Walton M. Wheeler,* for appellant.

*Cunningham & Ortmeyer,* for appellees.

CALDWELL, J.—Sarah M. Drew died intestate in Vanderburgh county, Indiana, in September, 1913.  By appointment of the Vanderburgh Circuit Court, appellee, Charles W. Hayward, is administrator of her estate.  Under the provisions of §2902 *et seq.* Burns 1914, Acts 1883 p. 158, appellant filed a petition for a partial distribution of the estate among the heirs.  To the petition the appellee, adminstrator, filed paragraphs of answers numbered third, fourth and seventh, among others unimportant here.   The other appellees filed like answers bearing like numbers.

Appellant's demurrer addressed severally to each of said paragraphs of answer filed by the adminstrator was overruled.   There was a like ruling on appellant's demurrer addressed severally to each of said para-

graphs of answer filed by the other appellees. The paragraphs of answer other than the third, fourth and seventh, being withdrawn, judgment was rendered against appellant for failure and refusal to plead over. The errors assigned are based on the rulings on the demurrers.

The further facts disclosed by the petition are to the following effect: The administrator has paid all the debts of the estate, and has in his possession for distribution among the heirs personal assets amounting to about $15,000. Decedent at the time of her death was seventy-five years of age. Prior to February 1, 1907, she had for many years been legally domiciled at Smithland in the State of Kentucky. February 1, 1907, she had become enfeebled in body and mind, and incapable of providing for her wants, or of determining any question for herself. She had no relatives living in or near Smithland. Thereupon on said day, appellees, who are nephews and nieces, and Virginia Hayward, their mother, having learned of decedent's condition, took charge of her and brought her to Evansville, in Vanderburgh county, for care and medical attention. Appellees shortly thereafter caused proceedings to be brought in the Vanderburgh Circuit Court, pursuant to which a guardian was appointed over the person and estate of decedent, and thereafter until her death appellees and the guardian had full custody and control of decedent's person and estate, and kept and maintained her in Evansville, Vanderburgh county, at the expense of her own estate. Decedent at the time of her removal from Smithland to Evansville and at all times thereafter was incapable of intelligent action in her own behalf, or of forming an intention with reference to any change of residence or domicil, and she did not attempt to and did not change her legal domicil from Smithland, Kentucky, but that place remained her legal resi-

dence and domicil to the date of her decease. She left as her only heirs at law appellant, a son of one of her deceased brothers, and appellees, Charles W., Walter S., James T., and Ruby Hayward, and Minnie L. Flick-ner and Adeline Heard, children of another deceased brother. The petition sets out certain statutes of the state of Kentucky to the effect that personal property where governed by the laws of that state descends to nephews and nieces *per stirpes*. Appellant prays a distribution on the basis of one-half to him and one-half to appellees other than the administrator.

The third paragraph of answer is to the effect that, February 1, 1907, there was no person capable of properly caring for decedent except appellant and appellees and Virginia A. Hayward, the mother of the latter; that on said day Virginia A. Hayward, pursuant to the request of decedent, took charge and custody of her person and removed her to the home of the former in Vanderburgh county, and changed and moved her legal residence and domicil from Kentucky to Vanderburgh county, Indiana; that continuously thereafter until her death decedent was an inmate of and was cared for in the home of Virginia A. Hayward, in Vanderburgh county; that all the acts of appellees and of Virginia A. Hayward in the premises were done for the welfare of decedent, and not for the purpose of changing the distribution or descent of her personal estate; that for many years prior to February 1, 1907, and continuously thereafter, decedent's entire personal estate was in Vanderburgh county; that after February 1, 1907, decedent's legal residence and domicil was not changed from Vanderburgh county.

The fourth paragraph of answer is to the effect that for many years prior to 1908 decedent's entire personal estate was in Vanderburgh county, and that throughout that year and continuously thereafter both

her person and her personal estate were in that county. Facts are averred to the effect that in 1908 the Vanderburgh Circuit Court, by a proceeding brought and regularly prosecuted under §3101 *et seq.* Burns 1914, Acts 1895 p. 205, appointed a guardian for the person and estate of decedent as a person of unsound mind. It is averred, also, that thereafter neither the guardian nor decedent removed the legal residence and domicil of the latter from Vanderburgh county. The theory of this paragraph is that by said proceeding the court adjudicated that the legal domicil of decedent was in Vanderburgh county.

The seventh paragraph of answer alleges generally that in a proceeding had in the Vanderburgh Circuit Court, the husband of appellee Minnie L. Flickner was appointed guardian of decedent, and that after his appointment he changed and removed the legal residence and domicil of decedent from Kentucky to Vanderburgh county, Indiana.

In determining the sufficiency of the respective paragraphs of answer, it must be taken as conceded that the actual facts are that on February 1, 1907, decedent was legally domiciled in the State of Kentucky; that on said day, and at all times thereafter, she was, by reason of mental infirmity, incapable of intelligent action in her own behalf, or of determining any question for herself, or of forming any intent with reference to changing or choosing a domicil, and that she did not by any act and intent of her own change her domicil from Kentucky, or choose one in Indiana. These

1.   facts must be taken as conceded, because they are so averred in the petition and are not traversed by the answers. By the answers, however, appellees seek to avoid the force and effect of such facts as follows: By the third paragraph, that Virginia A. Hayward, at decedent's request changed the latter's domicil

from Kentucky to Indiana; by the seventh paragraph, that the guardian, a stranger to decedent's blood, by virtue of his authority as such guardian, changed decedent's domicil as aforesaid; by the fourth paragraph, that the real facts respecting decedent's domicil may not be inquired into, as that question was adjudicated and set at rest by the proceedings wherein a guardian was appointed over decedent's person and estate.

It will be observed that primarily the sole question for our determination is whether under the averred facts decedent at the time of her decease was domiciled in Kentucky or Indiana. The importance of the question consists in the following: If decedent was domiciled in Kentucky, then her personal estate in the hands of the administrator must be distributed under the laws of Kentucky. By such laws, as pleaded, the personal estate of a decedent, as we have said, descends to nephews and nieces, where they are the sole heirs, *per stirpes,* and not *per capita,* and hence if that law governs, appellant is entitled to a full one-half of the personal estate of decedent, subject to distribution. But if decedent at her decease was domiciled in Indiana, then her personal estate subject to distribution must be distributed under the statutes of Indiana. By such statutes, where nephews and nieces are the sole heirs, they take the personal estate *per capita* and not *per stirpes.* It follows that, if the laws of Indiana govern, appellant takes one-seventh of decedent's personal estate in the hands of the administrator for distribution, and appellees, other than the administrator, take six-sevenths thereof. §2993 Burns 1914, §2470 R. S. 1881; *Baker* v. *Bourne* (1891), 127 Ind. 466, 26 N. E. 1078; *Blake* v. *Blake* (1882), 85 Ind. 65.

If the court erred in its ruling on the demurrer to each of said paragraphs of answer, this case must be reversed. If any one of such paragraphs is good

2. as against demurrer, it alone is sufficient to sup-. port the judgment, and the cause must be affirmed. *Williams* v. *Wood* (1915), 60 Ind. App. 69, 107 N. E. 683, and cases.

Appellees argue that, in order that a person of unsound mind may establish his domicil, a slight degree of understanding is sufficient, and that the mere fact that he is of unsound mind does not necessarily preclude him from establishing his domicil. Appellees cite such cases as *Culver's Appeal* (1880), 48 Conn. 165; *Mowry* v. *Latham* (1892), 17 R. I. 480, 23 Atl. 13; *Talbot* v. *Chamberlain* (1889), 149 Mass. 57, 20 N. E. 305, 3 L. R. A. 254. While not doubting the soundness of these decisions, the principle thereby announced is not applicable here. No question of the mental capacity of decedent to change or establish her domicil, or whether she did change it, or attempted to do so, is involved under the pleadings here. The effect of the petition here is that decedent did not have the mental capacity to change her domicil, or to form an intent to that end, and that she did not change her domicil from Kentucky to Indiana. Appellees by their answers do not controvert such allegations in the petition. On the contrary, they impliedly confess that the petition states the truth in such respects, and they seek to avoid the force of such alleged facts by pleading new matter: First, that Virginia A. Hayward changed decedent's domicil from Kentucky to Indiana; secondly, that the guardian after his appointment made such change; and, thirdly, that the Vanderburgh Circuit Court, in a proceeding brought and. prosecuted, adjudged that decedent's real domicil was in Indiana. It being directly averred in the third paragraph of answer that Virginia A. Hayward, and in the seventh paragraph that the guardian, changed decedent's domicil, as alleged, these paragraphs present for our determination the single question of the power

or authority of such respective persons in behalf of decedent to abandon her domicil in Kentucky, and to establish for her a domicil of choice in Indiana. The fourth paragraph presents the single question of whether the effect of the proceeding in the Vanderburgh Circuit Court was to adjudicate that decedent was domiciled in this state.

The question of when and under what circumstances the removal of a person from one place to another in search of health will indicate a change of domicil is thoroughly considered in a note to *Pickering* v. *Winch*, 9 L. R. A. (N. S.) 1159. That question, although urged upon our attention by appellees, is likewise, for reasons above indicated, not pertinent here.

We proceed to determine the sufficiency of the answers, and first the third and seventh paragraphs. On the subject of the relation between residence and domicil, we quote the following from *Long* v. *Ryan* (1878), 30 Grat. (Va.) 718: "There is, however, a wide distinction between domicil and residence, recognized by the most approved authorities everywhere. Domicil is defined to be a *residence* at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time. To constitute a domicil, two things must concur—first, *residence;* secondly, the intention to remain there. * * * Domicil, therefore, means more than residence. A man may be a resident of a particular locality without having a domicil there. He can have but one domicil at one and the same time, at least for the same purpose, although he may have several residences."

It is conceded in this case that prior to the time when decedent was brought from Smithland, Kentucky, to

Evansville, Indiana, the former place was her domicil. Such concession includes then not only that her residence was in such former place, but also that she intended to remain there permanently or indefinitely. Such place then was her residence in the sense that it was her fixed habitation; a place from which she might be absent temporarily and for temporary purposes, but which she regarded as her permanent home to be returned to when the purposes of her temporary absence had been accomplished. Eventually she came to Indiana. It is urged that such transfer of her bodily presence ripened into the acquisition of a new domicil, a domicil of choice in the latter place. "To constitute a change of domicil three things are essential: (1) Residence in another place; (2) an intention to abandon the old domicil; and (3) an intention of acquiring a new one, or, as some writers express it, there must be an *animus non revertendi* and an *animus manendi*, or *animus et factum*. (Authorities.) The *factum* is the transfer of the bodily presence and the *animus* is the intention of residing permanently, or for an indefinite period." *Pickering* v. *Winch, supra.* Dicey's Rule 7 respecting the domicil of natural persons is thus expressed: "Rule 7.—Every independent person can acquire a domicil of choice, by the combination of residence (*factum*) and the intention of permanent or indefinite residence (*animus manendi*), but not otherwise." Dicey, Conflict of Laws (2d ed.) 108.

There is no doubt that decedent acquired a residence in Indiana, and that she retained such residence until her death, using the term "residence" as signifying bodily presence merely. In the process of acquiring a domicil of choice, however, residence or length of residence alone, and in the absence of the necessary intent, is, as we have indicated, without effect.

*Dupuy* v. *Wurtz* (1873), 53 N. Y. 556; *Pickering* v. *Winch, supra.*

In the case at bar, as presented to us, the fact that decedent remained at Evansville a long time, rather than a short time, is of itself unimportant, as here we are dealing with the questions of power and of adjudication as indicated. It cannot be said here that decedent left Kentucky with the intent of abandoning her domicil, or that she came to Indiana with the intent of acquiring a new domicil, for the reason, as we have indicated, that it is impliedly conceded here that she did not have the mental capacity to form such an intent. We are thus brought to a consideration of the question whether either Virginia A. Hayward or the guardian had the power to form such intent for her as an incompetent person. The term "domicil" is expressive of a relation between person and place. As used, it indicates various degrees of comprehensiveness. Thus, such term may relate to permanency of residence in a nation, or in a subdivision exercising quasi-sovereign powers, with its own system of laws, as a state of the federal Union; or a smaller subdivision as a county, township, or municipality. Hence there may be "national domicil," relating to residence in a nation; "quasi-national domicil," relating to residence in a state; or "municipal domicil," sometimes referred to as "domestic domicil," relating to residence in a county, township or municipality. The first two are sometimes included in the term "national domicil." Jacobs, Law of Domicil §77.

A change of domicil involving a state of this country and a foreign country or two states of the federal Union involves also a change in the laws relating to the succession to, or distribution of, the personal property of a decedent. In this respect a change in national or quasi-national domicil differs from

a change in mere municipal domicil, or from one part of a state to another. For such reasons, the courts are more liberal in recognizing the power of a proper representative person to form the intent and perform the act requisite in changing the domicil of an incompetent person or a person *non sui juris,* where the change relates to municipal rather than to national or quasi-national domicil. It is urged that the national or quasi-national domicil of decedent was changed, and, if so, as we have said, certain laws of this state govern the distribution of personal property and are substituted for laws of Kentucky of a like nature.

We direct our attention now specifically to the third paragraph of answer. It discloses that appellant and appellees were the next of kin of decedent when she was brought to Indiana; that Virginia A. Hayward was not related to decedent by ties of blood, but that she was the widow of decedent's brother; that Virginia A. Hayward, rather than such next of kin, formed the intent and performed the act necessary in order to a change of decedent's domicil from one state to another. We know of no text-book or decided case that may be pointed to as supporting a contention that under the facts of this case Virginia A. Hayward had the power or authority on her own motion or at the request of decedent, conceded to have been incompetent, to affect a change in the quasi-national domicil of the latter. We are therefore required to hold the third paragraph of answer to be insufficient, and that the court erred in overruling the demurrer to it. That our conclusion is sound will become apparent, as we review the authorities. In support of the third paragraph, appellees, reasoning by analogy, resort to the case of infants and state the general proposition that after the death of the parents the next of kin of an infant having its custody may establish its domicil, and

may change such domicil from one state to another. It is a sufficient answer to such proposition that the third paragraph of answer alleges that Virginia A. Hayward had the custody of decedent, and that she was not the next of kin. However, we proceed to review the following authorities, cited by appellees: *Churchill* v. *Jackson* (1909), 132 Ga. 666, 64 S. E. 691, Ann. Cas. 1913E 1203, 49 L. R. A. (N. S.) 875; *Warren* v. *Hofer* (1859), 13 Ind. 167; *Hiestand* v. *Kuns* (1847), 8 Blackf. 345, 46 Am. Dec. 481; *Lamar* v. *Micou* (1884), 112 U. S. 452, 5 Sup. Ct. 221, 28 L. Ed. 751; *Lamar* v. *Micou* (1884), 114 U. S. 218, 5 Sup. Ct. 857, 29 L. Ed. 94; *In re Benton* (1894), 92 Iowa 202, 60 N. W. 614, 54 Am. St. 546.

The Churchill case involved no question of national or quasi-national domicil. The contest there was respecting which of two county courts in the state of Georgia had jurisdiction to appoint a guardian for an infant. It was held that where the parents of an infant are dead, the grandparents having its custody may as the next of kin change its domicil from the county to another, and especially where such custody has been awarded by the decree of a proper court. In *Hayslip* v. *Gillis* (1905), 123 Ga. 263, 51 S. E. 326, the court denied the existence of such a power in a person who is a stranger to the blood of the child. The Warren case presented the question of the change of the quasi-national domicil of a child, but it does not sustain appellee's contention. To the extent that it may be considered in point, its spirit is the other way. The Hiestand case involved a question whether the domicil of a child had been changed from Ohio to Indiana, and also the authority of an uncle by marriage. The matter of domicil is disposed of on the ground that the child, being in Indiana, but legally domiciled in Ohio, arrived at an age when by the law of the latter state she was authorized

to choose her own domicil, and that she chose the former state. The Lamar case was before the federal Supreme Court twice, first, on the original hearing as reported in 112 U. S. 452. We quote the following as indicating the doctrine announced in that case in the original hearing: "The father, and after his death the widowed mother, being the natural guardian, and the person from whom the ward derives his domicil, may change that domicil. But the ward does not derive a domicil from any other than a natural guardian. A testamentary guardian nominated by the father may have the same control of the ward's domicil that the father had. *Wood* v. *Wood*, 5 Paige, 596, 605. And any guardian, appointed in the state of the domicil of the ward, has been generally held to have the power of changing the ward's domicil from one county to another within the same state and under the same law. (Authorities.) But it is very doubtful, to say the least, whether even a guardian appointed in the state of the domicil of the ward (not being the natural guardian or a testamentary guardian) can remove the ward's domicil beyond the limits of the state in which the guardian is appointed and to which his legal authority is confined. (Authorities.) It is quite clear that a guardian appointed in a state in which the ward is temporarily residing cannot change the ward's permanent domicil from one state to another." It is evident that the language last quoted has a bearing also on the seventh paragraph of answer, and especially the concluding part of the quotation, since the seventh paragraph of answer proceeds on the theory that decedent's legal domicil was in the State of Kentucky when the guardian was appointed, although she was residing in Indiana, and that under such circumstances the guardian undertook to change her domicil to the latter state. The Lamar case when it was up for rehearing as re-

ported in 114 U. S. 218 contains some language sup-
porting the proposition that a natural guardian, not
a parent, may change the quasi-national domicil of an
infant. In that case, however, no question of the suc-
cession of property was directly involved. The Benton
case, also, to some extent sustains appellees' proposi-
tion in that it also holds that a natural guardian other
than a parent may change the quasi-national domicil
of an infant so as to vest in a court of the new domicil
jurisdiction to appoint a guardian for the infant. It is
expressly said, however, in the opinion that, while the
next of kin may not change the domicil of an infant so
as to affect its rights of succession or of property, yet
if the change is made in good faith a new domicil may
be acquired which will give a probate court jurisdiction
to appoint a guardian at law for it. These cases, in
any event, do not support appellees' contention under
the facts here, since Virginia A. Hayward was in no
sense a natural guardian of decedent. It will be ob-
served from some of the cases above discussed, as well
as other cases and text-books to which we shall refer,
that, in determining questions of the power of a guard-
ian to affect a change in the domicil of an incompe-
tent or a person *non sui juris*, importance is attached
not only to the question whether the change affects the
national or quasi-national domicil rather than merely
the municipal domicil, but also to the question of the
nature of the guardianship and the source of the guard-
ian's power, as whether he is a natural guardian, as
a parent or next of kin, a testamentary guardian, as one
named in a will, or a guardian appointed in a court pro-
ceeding brought to that end. In support of the proposi-
tion that the guardian of an insane person may estab-
lish and change the domicil of his ward, appellees cite
*Brookover* v. *Kase* (1907), 41 Ind. App. 102, 83 N. E.
524; *Anderson* v. *Anderson* (1869), 42 Vt. 350, 1 Am,

Rep. 334; *Matter of Robitaille* (1912), 78 Misc. Rep. 108, 138 N. Y. Supp. 391. In the Brookover and Anderson cases, respectively, the court was considering a change in municipal rather than quasi-national domicil, and what is said in each of these cases must be considered accordingly. The Robitaille case presented the question whether the courts of a province of Canada, rather than the courts of New York, had jurisdiction primarily to direct the administration of the estate of Robitaille under his last will and testament. The question of jurisdiction depended on whether the guardian of Robitaille, an insane person, had the power to transfer the ward's domicil from New York to Canada. The court held that under the peculiar facts and for the purposes of that case such power existed. Briefly, such facts were that Robitaille had originally been domiciled in Canada. He had moved to New York, however, engaged in business, and established his domicil there. Subsequently he sold his business, and announced his intention to return to Canada where his people lived. Before he executed his intention, he suddenly became insane, and a guardian was appointed. The guardian removed him to Canada, where he died testate. An analysis of the opinion discloses that the fact that the testator had formed such intent, together with the further fact that no question of succession to his property was involved, controlled the decision. The court say that the fixed intent of the testator to establish his domicil in Canada was a very controlling circumstance, and also that, if it should be made to appear subsequently that any rights of a citizen of this country to the estate of testator were adversely affected by the decision, relief might be had on application for reargument.

Appellees state also a proposition to the affect that the guardian of an infant has authority by virtue of his

position to establish and change the domicil of his ward. In addition to cases which we have already discussed, appellees cite the following: *Kirkland* v. *Whately* (1862), 86 Mass. 462; *Wilkins' Guardian* (1892), 146 Pa. 585, 23 Atl. 325; *Wheeler* v. *Hollis* (1857), 19 Tex. 522, 70 Am. Dec. 363; *In re Kiernan* (1902), 77 N. Y. Supp. 924. Appellees seek to apply the doctrine of such cases by analogy to the question here. In the Kirtland case, the question was respecting the power of a guardian to change the municipal domicil of his ward. The Wilkins case holds that an infant may have a residence for the purpose of nurture, education, etc., distinct from its legal domicil controlling the descent and distribution of its property, and that it is within the power of the guardian to change the former. In the Wheeler case, the stepfather was guardian of the infant involved. The decision is to an extent controlled by the fact that the mother of the child considered by the court as in the nature of a natural guardian was a party to the change of domicil. In the Kiernan case the guardian was both a testamentary and a natural guardian, and, moreover, the court citing *White* v. *Howard* (1868), 52 Barb. 294, grounds its opinion on the fact that the father of the child by his last will and testament impliedly directed that the child's domicil be changed from New York to Connecticut.

However, a study of the decided cases is convincing that courts and law-writers are not in entire harmony with respect to the authority of an appointed guardian on his own motion to change the national or quasi-national domicil of his insane ward. Jacobs deduces from the authorities the following: "With respect to the power of the guardian to change the national or quasi-national domicil of his insane ward, much that has already been said with respect to the guardianship of minors is applicable. It does not appear ever to have

been held, either in this country or in England, that he has such power.   Phillimore thinks he has, and rests his opinion upon several Scotch cases, which, however, do not seem to bear him out. Westlake and Dicey maintain the opposite view, and upon general principles there appears no good reason why the guardian should be held to possess such power." Jacobs, Law of Domicil §265.

From an analysis of a large number of decisions, Jacobs states the following as the general result of the American cases respecting the power of the guardian of an infant to change its domicil: "1.   That a guardian has the power to change the municipal domicil of his ward.   (2)   That the domicil of the ward is not necessarily that of his guardian.   (3)   That the natural guardian certainly, and the testamentary guardian probably, has the power to change the national or quasi-national domicil of his ward, unless expressly prohibited by a competent court.   (4)   That the power of an appointed guardian to change the national or quasi-national domicil of his ward is, to say the least, very doubtful." Jacobs, Law of Domicil §260.

Dicey recognizes that there are two views of the subject under consideration:   First, that an insane person retains the domicil which he possessed when he began to be legally treated as insane; secondly, that the guardian or committee of such an insane person may change his domicil at will, if actuated by proper motives.   He states that the first view is sound, and that it is favored by the English cases; that the second view is favored by some American cases, but that it is open to objection in that it ascribes to a guardian greater authority than a father has as a natural guardian; that the latter may not establish for his child a domicil separate from his own domicil.   He states, from an examination of the cases, that the second view arises from a confusion

between the power to change the residence of an insane ward, and the right to change his domicil. Dicey, Conflict of Laws (2d ed.) 149.

Wharton says in substance that whether the domicil acquired when sane can be divested by a guardian of the ward after the latter has become insane may be doubted; that the proper course for the guardian to pursue in order to change the domicil is to obtain an order of court to that effect. He quotes from Westlake that in France the rule has been modified to the effect that a guardian there is now recognized to have such power, and that the basis of the modification is the fact that laws and customs have become uniform throughout the French Republic, and that the reasons for the modification are not applicable to the British Empire with its many systems of law. Wharton then says that Westlake's reasons apply equally to the United States, and that the better view is that a person under guardianship for lunacy is entitled to the same rights as to domicil as an infant. Wharton, Conflict of Laws (3d ed.) §52. In the same work, the author says that, as the law of succession varies so much in passing from state to state, the power of arbitrarily changing succession by changing the minor's domicil is one which no guardian ought to possess. §42. And that it is clear that a guardian appointed in a state in which the ward is not domiciled, but is temporarily residing, cannot change the latter's permanent domicil. §42a.

In addition to the cases already discussed, the following are to the effect that an appointed guardian of an insane person by virtue of his office may not on his own motion change the domicil of his ward from one state to another, so as to change or affect the succession of his property on his decease. *Daniel* v. *Hill* (1875), 52 Ala. 430; *Talbot* v. *Chamberlain, supra; Mears* v. *Sinclair* (1865), 1 W. Va. 185; *Ex Parte Bart-*

*lett* (1857), 4 Bradf. Sur. (N. Y.) 221; *Sumrall's Committee* v. *Commonwealth* (1915), 162 Ky. 658, 172 S. W. 1057.

The seventh paragraph of answer, as we have said, proceeds on the theory that, at the time of the appointment of the guardian, decedent was domiciled in Kentucky, and that the guardian after his appointment changed decedent's domicil from Kentucky to Indiana. Under such circumstances, the laws of the former state are entitled at least to respectful consideration, as the change of domicil, if valid, affected the status of a person legally domiciled in that state. In the case last cited, the Court of Appeals of Kentucky said: "The brief of appellant's counsel seems to take no account whatever of the distinction between the within-state or municipal domicil and the out-of-state, national or quasi-national domicil, or to realize the fact that in this jurisdiction the right of the committee to change the domicil of the ward by removing it to another state has never been recognized." In support of its conclusion the court quotes with approval from Minor's Conflict of Laws, pages 108 and 109, as follows: " 'The question remains, what is the locality of the lunatic's domicil when he is himself too insane to choose one? Shall the guardian or committee have power to change it, or must it remain unalterably where it was when the disability was first incurred? This case is closely analogous to that of the guardian's power to change his infant ward's domicil, already discussed. As to the lunatic's municipal domicil, it seems that the guardian has the power, but not so with respect to his national or quasi-national domicil. His latter domicil will remain unchanged regardless of the place of his actual residence. He will retain the domicil he possessed before he became insane, upon the principle that

a domicil once acquired is retained until another is gained.'"

We conclude that, while the question is not free from difficulty, the guardian of an insane person does not have the power or authority, by virtue of his office, on his motion to change the legal domicil of his ward from one state to another, so as to affect the distribution or succession of the ward's property on his decease, and especially where the ward, although residing in the jurisdiction of the appointment, is legally domiciled in another state. It follows that the court erred in overruling the demurrer to the seventh paragraph of answer.

A consideration of the nature of a guardianship over the person and property of the insane confirms us in our conclusion. Primarily, in the absence of a statute, courts exercising chancery powers, *ex necessitate,* are clothed with power in matters that affect the welfare and the personal and property rights of the insane, and to that end they appoint guardians who become administering agencies of the court, and subject to its supervision. 22 Cyc 1120; *In re Sall* (1910), 59 Wash. 539, 110 Pac. 32, 626, 140 Am. St. 885. In this state such power is lodged in courts having probate jurisdiction. §3101 Burns 1914, *supra.* Where, pursuant to a proper proceeding, such a guardian is appointed, his powers and duties outlined and prescribed by statute (§§3068, 3107 Burns 1914, §§2521, 2551 R. S. 1881) must be exercised and performed under the supervision of the court. Doubtless, situations may arise wherein it is apparent that the best interests of the ward require that his legal domicil be changed from one state to another. Such a change of domicil, however, involves very important consequences. Thus, thereby one system of laws as affecting the person and personal estate of the subject of

the change of domicil becomes substituted for another system. The nature of a guardianship, as we have said, is such that in the important matters of his trust, the guardian is governed and controlled by the supervisory powers of the court. We believe that doctrine to be soundest which is to the effect that an appointed guardian may change the quasi-national domicil of his ward only by proceeding under an order of court. The guardian here proceeded on his own motion. Wharton, Conflict of Laws §§42, 52; State, ex rel. v. Lawrence (1902), 86 Minn. 310, 90 N. W. 769, 58 L. R. A. 931; Wilkins' Guardian, supra; Matter of Robitaille, supra, 397; Hill v. Horton (1886), 4 Dem. Sur. (N. Y.) 88; 9 R. C. L. 551.

We proceed to consider the fourth paragraph of answer: Section 3101 Burns 1914, supra, is in part as follows: "Whenever any person shall by a statement in writing represent to the court having probate jurisdiction, in any county, that any inhabitant of such county is a person of unsound mind and incapable of managing his own estate, such court shall cause such person to be produced in court and shall cause an issue to be made by the clerk of such court denying the facts set forth in such statement;" and trial had as provided by the section. Section 3102 Burns 1914, Acts 1895 p. 205, provides in substance that, if the issue should be determined in the affirmative, the court shall appoint a guardian for such person who shall have the custody of his person and the management of his estate.

The fourth paragraph of answer alleges facts to the effect that in 1908 Virginia A. Hayward filed in the Vanderburgh Circuit Court the statement in writing contemplated by §3101, supra, and that such proceedings were thereafter had as that the court appointed the husband of appellee Flickner guardian of the person and estate of Sarah M. Drew; that thereafter

neither the guardian nor decedent changed or removed the latter's legal domicil from Vanderburgh county, Indiana.

It is appellees' contention that by such proceeding the court adjudged not only that decedent was a person of unsound mind, incapable of managing her own estate, but also that her domicil was in Vanderburgh county, Indiana, and that such adjudication fixed the status of decedent as domiciled in Indiana, for all purposes, and conclusive against collateral attack.   Appellees cite such cases as *Soules* v. *Robinson* (1901), 158 Ind. 97, 62 N. E. 999; *Cunningham* v. *Tuley* (1899), 154 Ind. 270, 56 N. E. 27; *Williams* v. *Dougherty* (1906), 39 Ind. App. 9, 78 N. E. 1067; *Dequindre* v. *Williams* (1869), 31 Ind. 444.

The first three cases cited in effect hold that where a court of general jurisdiction of a certain county entertains a proceeding to appoint a guardian of an infant or of a person of unsound mind, or an administrator of the estate of a decedent, or to probate the last will of a testator, on the representation that the person involved is or was a resident or inhabitant of such county, and action is taken by the court accordingly, the judgment is conclusive as against attack based on a like proceeding subsequently had in a proper court of some other county on the assumption or representation that such involved person is or was a resident or inhabitant of such county.   In the Dequindre case, by proceedings had in the proper court of Knox county, a guardian was appointed for certain infants as residents of such county.   Subsequently, by proceedings had under the statute, the guardian sold and conveyed certain lands owned by his wards.   Later, the wards having arrived at full age, they or their representatives brought suit to recover the lands asserting that at the time of the appointing of the guardian they were legally

domiciled in Illinois, and therefore that the court did not have jurisdiction to appoint the guardian, and that as a consequence, not only the appointing of the guardian, but also his act in selling the land, was void and not binding on them.   It is held that it was within the province of the Knox county court to determine the jurisdictional fact of the residence of the infants, and that, having done so, its action in the premises for purposes of the proceeding was conclusive against collateral attack.

These cases are authorities that where a court with power to act in the general subject-matter involved determines a jurisdictional question of residence

13. in a proceeding to appoint a guardian, or an administrator, or the like, the determination of the court for the purposes of executing the involved trust and transacting the business thereof is conclusive against collateral attack.   They are not authorities in support of the proposition that such determination is effective for purposes totally disconnected from the matter in hand.   We are not concerned here with the question whether the Vanderburgh Circuit Court, by its decree appointing the guardian of the person and estate of Sarah M. Drew, thereby for purposes of the created trust determined conclusively against collateral attack that she was at the time an inhabitant of Vanderburgh county.   No one disputes that fact.   No one is attacking that trust or its execution.   Its validity is impliedly conceded by the parties to this proceeding.   The question here is whether, for purposes of succession to her personal property, the court in that proceeding adjudicated that she was legally domiciled in Indiana, rather than in Kentucky.

We do not find it necessary in this case to determine whether the word "inhabitant," as used in §3101, *supra,*

includes only one legally domiciled in this state, or whether it is more comprehensive in meaning.

However, a situation is possible wherein a person residing in this state has property and an established business here, surrounded by the indicia of permanency of residence, his legal domicil being in fact elsewhere. It is our judgment that such section is broad enough to include such a case. There are other sections of the statute, *supra,* as §3105 and §3106, (§§2549, 2550 R. S. 1881) by virtue of which courts are given jurisdiction to appoint guardians of insane persons, who when appointed are authorized to take charge of the property of such person within the jurisdiction of the court. Such sections apparently apply to insane persons who reside beyond the state, or beyond the county in which the probate court authorized to act exercises jurisdiction, in the sense that the bodily presence of such persons is beyond the limits of the state or county, there being property of the incompetent within such county. The purpose of a guardianship created under such sections is the preservation of such property. A proceeding under §3101, *supra,* is prosecuted in fact by the public, and for the benefit of the insane person and his property. We do not believe that if an action were instituted under said section, and on a hearing it developed that the person involved was not technically domiciled in this state, the court would then have recourse to one of such subsequent sections, the proceeding resulting in a decree for the care of the property, and the insane person being permitted to go hence unattended. Such a presumption would be out of harmony with the entire theory under which such proceedings are prosecuted. On this subject, the Supreme Court of Iowa, in constru-

ing a statute very similar to §3101, *supra,* and containing a provision that a guardian may be appointed when a petition is presented that any inhabitant of the county is of unsound mind, etc., has the following to say: "We are unable to agree with counsel that jurisdiction in guardianship cases is made to depend upon a strict construction of the word 'inhabitant,' as found in the statute. We think it was meant to provide a means whereby the property of persons of unsound mind, living or being at the time within this state, might be preserved and cared for. No other purpose or intent is to be gathered from the statute. Now, it may frequently happen that a person having his legal residence in a sister state has for a more or less extended period before becoming mentally deranged, actually lived in this state, and that much or possibly all his effects are in this state. It is not within reason to say that in his interest and for his benefit the courts are powerless to provide for the care and protection of his property. And it would be absurd to say that if, upon proceedings being brought for the appointment of a guardian, proof of the legal domicil or residence shall not be accessible, the proceedings must abate, and the property of the unfortunate be cast out, to find its way into such hands as may be in waiting to seize and make disposition of it. So too, it must be taken into account that very important property rights may depend upon the fact of legal residence. It is not difficult to conceive that rights of homestead, of qualified life estate, and perhaps of conditional gifts and bequests, etc., may be made to thus depend. To say that it was intended that the appointment of a guardian should have effect to thus deprive the helpless subject of such proceedings of his property rights would be to announce a rule at once intolerable and unjust. On

the contrary, as we think, the object of the statute was to benefit, not to despoil, the unfortunate." *Brown* v. *Lambe* (1903), 119 Iowa 404, 93 N. W. 486.

In any event, while inhabitancy within the meaning of the statute must first be established as a jurisdictional fact, the primary object of the proceed-
16. ing is not to ascertain whether the person involved is domiciled in this state, but rather to establish his mental capacity as measured by his ability to manage his own estate. *Hughes* v. *Jones* (1889), 116 N. Y. 67, 22 N. E. 446, 5 L. R. A. 632, 15 Am. St. 386. Where in such a proceeding there is an adjudication of unsoundness of mind, such adjudication is not conclusive in its relation to some other proceeding in which is brought in question the mental capacity of the person involved as manifested in some field of activity other than the management of his own estate. *Taylor* v. *Taylor* (1910), 174 Ind. 670, 93 N. E. 9; *Harrison* v. *Bishop* (1892), 131 Ind. 161, 30 N. E. 1069, 31 Am. St. 422; *Pepper* v. *Martin* (1910), 175 Ind. 580, 92 N. E. 777; *Blough* v. *Parry* (1896), 144 Ind. 463, 493, 40 N. E. 70, 43 N. E. 560.

As we have indicated, a proceeding for the appointment of a guardian for an insane person has its foundation in the theory that the public has an interest
17. in the welfare of such unfortunates and in the preservation of their property, and that such interest is promoted by the public through an authorized representative taking charge of any such person and his property and preserving the latter from waste, it being ascertained first that such person is unable to care for either himself or his property. It follows that, while the law is set in motion by information brought to the court by some third person, the public, as in criminal prosecutions, rather than the person furnishing such

information, is the real party in interest.   We conclude that, assuming that the word "inhabitant," as used in the statute, is so restricted in meaning as to include only persons legally domiciled in this state, the court in the guardianship proceeding determined the question of inhabitancy only for purposes of that proceeding.   It is our judgment that in that proceeding there was no adjudication binding on appellant in the case at bar that Sarah M. Drew was domiciled in Indiana, in the sense that the laws of this state determine the question of the distribution of her personal property, and as stated in *Brown* v. *Lambe, supra,* that the parties here are free to make such proof on the subject of the domicil of decedent at the time of her decease as may be within their power.   As having a bearing, see the following:   *Brown* v. *Lambe, supra; Hughes* v. *Jones, supra; Mutual, etc., Ins. Co.* v. *Tisdale* (1875), 91 U. S. 238, 23 L. Ed. 314; *Scott* v. *McNeal* (1893), 154 U. S. 34, 14 Sup. Ct. 1108, 38 L. Ed. 896; *Wood* v. *Davis* (1812), 7 Cranch 271, 3 L. Ed. 339; *Oborn* v. *State* (1910), 143 Wis. 249, 126 N. W. 737, 31 L. R. A. (N. S.) 966, 974; *American Woolen Co.* v. *Lesher* (1915), 267 Ill. 11, 107 N. E. 882; *Way* v. *Way* (1872), 64 Ill. 406; 1 Van Fleet, Former Adjudications §520; *Luke* v. *Hill* (1911), 137 Ga. 159, 73 S. E. 345, 38 L. R. A. (N. S.) 359, and note; *Bolton* v. *Schriever* (1892), 18 L. R. A. 242; *Baker* v. *Baker, etc., Co.* (1915), 162 Ky. 683, 173 S. W. 109; *Brigham* v. *Fayerweather* (1886), 140 Mass. 411, 5 N. E. 265; *Dallinger* v. *Richardson* (1900), 176 Mass. 77, 57 N. E. 224.

The judgment is reversed, with instructions to the court to sustain the demurrer to the third, fourth, and seventh paragraphs of answer, and with permission to plead over if desired.

## ON PETITION FOR REHEARING.

CALDWELL, J.—Appellees insist that the complaint or petition does not state a cause of action, and that as a consequence this court should have carried the demurrers filed to the answers back to the complaint and sustained them to the latter. Appellees' contention is based on the assumption that the complaint discloses that appellees and their mother, Virginia A. Hayward, changed Sarah M. Drew's legal domicil from Kentucky to Indiana. In indulging such assumption, appellees do not distinguish between "residence" and "legal domicil." The complaint goes no further than to allege that for purposes of care and medical attention the persons named removed Sarah M. Drew—that is, transferred her bodily presence—from the one state to the other. In fact, the complaint expressly avers that for fifty years prior to such removal, Sarah M. Drew's residence and legal domicil were at Smithland, Kentucky, and "that said point remained her legal residence and domicil up until the date of her death." Under the facts averred, it was very commendable in appellees to take charge of Sarah M. Drew and look after her physical needs in her last days, and was eminently proper for them to remove her person to their own homes in order that they might more conveniently do so. A change in the legal domicil of Sarah M. Drew, however, was not necessary to that end. In the original opinion, we held that no paragraph of answer presented the question of the power of the next of kin of an incompetent person to change his legal domicil from one state to another, such change involving the descent of or succession to his personal property on his decease. Incidentally, however, we discussed that question. The evil results that might flow from the recognition of such a power unrestricted in the next of kin of such a

person, and especially in but a part of the relatives composing the nearest degree of consanguinity, are illustrated by the possibilities here. It so happens that if Sarah M. Drew were legally domiciled in Indiana, rather than in Kentucky, at the time of her decease, appellees profit thereby. If she were legally domiciled in Kentucky, rather than in Indiana, appellant profits thereby. Appellant and appellees stood in the same degree of consanguinity to Sarah M. Drew. If the latter, by reason of their relationship, had the power to change her domicil from Kentucky to Indiana, then the latter, by reason of a like relationship, had the power to prevent such change, or to rechange such domicil back to Kentucky. It thus appears that the recognition of such an unrestricted power might involve a constant contest among the relatives of an aged incompetent for the possession of his person, and to the destruction of the peace and comfort of his last days. It is proper to say, however, that the record here reveals no hint of suspicion that appellees, or their mother, or the guardian, were moved by any other than the best and purest motives in any action taken by them respecting Sarah M. Drew in the days of her alleged incompetency.

It is alleged, also, that we misinterpreted *Hiestand* v. *Kuns* (1847), 8 Blackf. 345, 46 Am. Dec. 481. The decision in that case is indicated by the following contained in the opinion. "The child takes the domicil of the parent, and cannot, as a general rule, while under age, *proprio marte,* change that domicil; nor is the power of the guardian to effect such change unlimited. * * * It may, therefore, well be doubted whether any change had taken place in Rosanna's domicil prior to her becoming eighteen years old. If not, then at that age she was still under the law of Ohio, and by it became at that time of age, and capable of choosing a domicil for herself. We are satisfied from the evidence

upon the record that she did then make such choice; that she did then determine to make Indiana her future permanent abode; and there thus being a concurrence of actual 'residence and intention of making it the home of the party,' the domicil here, according to Story, was complete."

The original opinion is not open to a construction that appellees are foreclosed by the fact that their answers are insufficient. An issue may be formed, if desired, whether Sarah M. Drew was mentally competent to change her own domicil, and whether she did so.

Petition for a rehearing overruled.

NOTE.—Reported in 115 N. E. 966, 116 N. E. 746. Domicil: terms synonymous, Ann. Cas. 1915C 783, 14 Cyc 834, 835; incidents of, 48 Am. St. 711. See under (4) 14 Cyc 838; (5, 6, 8-12) 14 Cyc 845, 848, 849; (7) 14 Cyc 833.